d

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

GREGORY JOSEPH GOUGH,
Plaintiff

CIVIL DOCKET NO. 1:19-CV-01183

VERSUS

JUDGE DRELL

STEVEN MCCAIN, ET AL.,
Defendants

MAGISTRATE JUDGE PEREZ-MONTES

---

### REPORT AND RECOMMENDATION

Before the Court are four Rule 12(b)(6) Motions to Dismiss filed by Defendants.[1] ECF Nos. 20, 21, 44, 48. Because claims against Defendants in their individual capacities are not cognizable under the ADA, Defendants' Motions to Dismiss (ECF Nos. 20, 21, 44, 48) should be granted in part and Gough's ADA claims against Coroner Nugent, Bullock, Watkins, Sudduth, and Churchman in their individual capacities should be DISMISSED WITH PREJUDICE. Because Gough is

---

[1] The named Defendants are Grant Parish Sheriff Steven McCain ("Sheriff McCain") (in his individual and official capacities); Warden Bradley Charles Sudduth ("Sudduth") (warden of the Grant Parish Detention Center ("GPDC") (in his individual and official capacities); John Clay Churchman ("Churchman") (assistant warden of GPDC, in his individual and official capacities); Roy Dean Nugent ("Coroner Nugent") (coroner of Grant Parish, in his individual and official capacities); James ("Jay") Paul Lemoine ("Lemoine") (District Attorney of the 35th Judicial District in Grant Parish, in his individual and official capacities); Theresa Lynn Grice ("Grice") (nurse at GPDC, in her individual capacity); Deputy Chance Damien Durand ("Durand") (correctional officer at GPDC, in his individual capacity); Deputy Steven Wayne Fitzhugh ("Fitzhugh") (correctional officer at GPDC, in his individual capacity); Jody Bullock ("Bullock") (Grant Parish Sheriff's Deputy and investigator for the Grant Parish Coroner, in his individual capacity); James L. Watkins ("Watkins") (Grant Parish Sheriff's Deputy and investigator for the Grant Parish Coroner, in his individual capacity); "Doe Defendants" (unidentified employees of the Grant Parish Sheriff); and the Parish of Grant ("Grant Parish") (collectively, "Defendants"). ECF Nos. 1, 39.

voluntarily dismissing his claims against District Attorney Lemoine as premature, his Motions to Dismiss (ECF Nos. 21, 48) should be granted in part and Gough's claims against Lemoine should be DISMISSED WITHOUT PREJUDICE. Because Gough has stated claims in all other respects, Defendants' Motions to Dismiss (ECF Nos. 20, 21, 44, 48) should be DENIED IN PART as to all other claims against Defendants.

## I.    Background

### A.    Procedural Background

Plaintiff Gregory Joseph Gough ("Gough") filed a civil rights Complaint and First Amended Complaint under 28 U.S.C. § 1983, the Americans with Disabilities Act of 1990 (P.L. 101-336, § 933, 104 Stat. 327 (July 26, 1990)), the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") (P.L. No. 110-325, § 2(a)(4)-(6), 122 Stat. 3553 (effective January 1, 2009)) (42 U.S.C. § 12131, *et seq.*), and Louisiana state law. ECF Nos. 1, 39.

Gough alleges in his Amended Complaint (ECF NO. 39):

(1) Sheriff McCain, Sudduth, and Churchman (official capacities), and Grant Parish maintained a *de facto* policy that created conditions and permitted treatment of prisoners that constituted impermissible punishment in violation of due process, and are liable to Gough under 42 U.S.C. § 1983;

(2) Sheriff McCain, Sudduth, and Churchman (official capacities), and Grant Parish subjected Gough to unconstitutional conditions of confinement that constituted impermissible punishment in violation of due process, and are liable to Gough under 42 U.S.C. § 1983;

(3) Sheriff McCain, Sudduth, and Churchman (official capacities), and Grant Parish established a system in which prisoners with serious medical needs

are denied access to medical care, and are liable to Gough under 42 U.S.C. § 1983;

(4) Sheriff McCain, Sudduth, and Churchman (individual and official capacities) failed to supervise the other Defendants to ensure prisoners received appropriate medical care for serious medical needs, and are liable to Gough under 42 U.S.C. § 1983;

(5) Sudduth and Churchman (individual and official capacities) were deliberately indifferent to Gough's right to medical/mental health care for his serious medical needs, and are liable to Gough under 42 U.S.C. § 1983;

(6) Sheriff McCain, Sudduth, and Churchman (official capacities), and Grant Parish, established a policy, pattern, or practice to deny medical care to prisoners with serious mental health problems and needs, and are liable to Gough under 42 U.S.C. § 1983;

(7) Fitzhugh, Durand, Grice, and Does, (individual capacities), acting in accordance with practice or custom within the Grant Parish Sheriff's office, and with deliberate indifference, ignored Gough's basic human needs, misclassified him and placed him in solitary confinement, failed to obtain a mental or psychological evaluation, denied him access to appropriate mental health care, and when health care was provided did so in an unconstitutional manner, and are liable to Gough under 42 U.S.C. § 1983;

(8) Coroner Nugent (individual and official capacity), Sheriff McCain (official capacity), Grant Parish, and Bullard, Watkins, Sudduth, and Churchman (in their individual capacities), denied Gough benefits of Grant Parish services, programs, or activities (including those of the Grant Parish coroner and the GPDC/Sheriff) in violation of Title II of the ADA;

(9) Fitzhugh, Durand, Grice, and Does (individual capacities) negligently injured Gough, causing exacerbation of and prolongation of his mental illness and are liable to Gough under La. C. C. art. 2315;

(10)   Fitzhugh, Durance, Grant, and Does (individual capacities) committed assault and battery on Gough in violation of state law and are liable to Gough under La. C. C. art. 2315; and

(11)   Sheriff McCain is vicariously liable for the actions of his Defendant-employees under La. C. C. arts. 2315, 2317.1, and 2322.

3

Churchman, Durand, Fitzhugh, Grice, Sheriff McCain, Sudduth, Bullock, and Watkins filed Motions to Dismiss under Fed. R. C. P. 12(b)(6) (ECF No. 20, 44), arguing that all of Gough's claims are untimely, and that individual capacity claims are not cognizable under the ADA.[2]

Lemoine, Coroner Nugent, Grant Parish, Bullock and Watkins filed Motions to Dismiss under Fed. R. Civ. P. 12(b)(6) (ECF Nos. 21, 48), contending that all of Gough's claims are untimely; that Gough dropped his claims against D.A. Lemoine; that Gough fails to state a claim under the ADA against Coroner Nugent, Bullock, Watkins, and Grant Parish; and that Gough's complaint is barred by *Heck v. Humphrey*.

Gough opposes those Motions.  ECF Nos. 24, 28, 46, 47.

### B.    Factual Background

The facts of this case are from the Amended Complaint (ECF No. 39) and the Forensic Psychological Evaluation ("FPE") that was filed in support of the complaint (ECF No. 35).

---

[2] Bullock and Watkins are represented by two separate counsel, one purporting to represent them in their official capacities as Sheriff's employees, and the other purporting to represent them in their individual capacities as investigators for the Coroner.  ECF Nos. 44 and 48. Counsel for Bullock and Watkins in their individual capacities, stated they represent them in their "roles as investigators of the Office of the Coroner."  ECF No. 48 at 5. It appears they address "official capacity" claims as their role with the Coroner, as well as individual capacity claims against them. Unfortunately, counsel presented conflicting defenses for Bullock and Watkins.  This is likely due to the Amended Complaint which alleges "individual capacity" claims against Bullock and Watkins, but in their "roles" as both Sheriff's Deputies and Investigators for the Coroner's office. ECF No. 39 at 7-8.

4

Gough's developmental history was gathered by forensic psychologists through interviews with Gough and his mother.  ECF No. 35 at 2.  Gough was a student-athlete in high school and college, but eventually dropped out of college.  ECF No. 35 at 3.  Gough reported he was diagnosed with ADHD in college, and prescribed Adderall and Ritalin off and on for several years.  ECF No. 35 at 4.  He started working in Florida, where he began abusing substances and got into some trouble.  ECF No. 39 at 4.  Gough then returned home and re-enrolled in college.  ECF No. 35 at 3.  Gough graduated with a degree in computer science in 2004.  ECF No. 35 at 4.  Gough is currently working in Lafayette and enrolled in school, pursuing an MBA.  ECF No. 35 at 4.

After earning his bachelor's degree, Gough worked in Baton Rouge, Wisconsin, and New Mexico.  ECF No. 35 at 4.  Gough reported working too much overtime, getting too little sleep, and becoming very ill.  ECF No. 35 at 4.  He moved to Nashville to pursue to relationship and worked there.  ECF NO. 35 at 4.  But he reportedly began to experience significant relationship difficulties, became reclusive, and significantly reduced his social interactions.  ECF No. 35 at 4.  Gough lost his job due to a conflict with a supervisor and became occasionally homeless.  ECF No. 35 at 4.

Gough's first psychiatric hospitalization occurred in high school after he and his father "had a fight."  ECF No. 35 at 5.  Gough's hospitalization lasted two weeks and he was not prescribed any medication.  ECF NO. 35 at 5.

Gough stated his mental health problems began with ADHD in college and were aggravated by the stress put on student-athletes. ECF NO. 35 at 4. Gough was having problems dealing with everyday life. ECF No. 35 at 4. And he had a high degree of work stress in the computer technology industry and frequently felt depressed. ECF No. 35 at 4.

In 2013, Gough began exhibiting signs of paranoia and started having difficulty in personal and work relationships, becoming argumentative and jealous, and withdrawing from social activities. ECF No. 35 at 4. He began to have panic attacks; became paranoid; believed others (including Mark Zuckerberg) were watching him; believed that people on TV were talking about him; and was hearing and thinking bad things. ECF No. 35 at 4-5. Routine occurrences began to take on personal significance. ECF NO. 35 at 5.

In 2015, while Gough was working as a software engineer in Tennessee, he became delusional and paranoid, believing he was chosen to become president of the United States. ECF No. 39 at 9-10. Gough believed he was being monitored by the government; that other individuals (including his parents) were attempting to torture him to force him into politics; and that the Republican party had selected him to run for president. ECF No. 35 at 5. He doubted his true ethnicity, thinking he was Asian and that his parents were not telling him the truth. ECF No. 35 at 5. Gough believed DNA tests had been developed because of him and that he could become "the richest person in the world" because of the development of DNA technology and his ideas.

6

ECF NO. 35 at 5.  He tore the walls out of his apartment looking for microphones and wore clothing with messages about being tortured.  ECF No. 35 at 5.  He wrote on his car to communicate his need for help, and believed he was the "prince of poverty" who was "chosen by society to be president from the time [he] was born."  ECF No. 35 at 5.  Gough's aberrant behavior and statements attracted attention (ECF No. 39 at 10) and he was hospitalized in the Middle Tennessee Mental Health Institute for evaluation from March 18, 2015 through March 31, 2015.  ECF No. 35 at 5.

Gough was anxious and paranoid, and had grandiose and persecutory delusions.  ECF No. 35 at 5.  Gough was diagnosed with psychotic disorder not otherwise specified and cannabis abuse. He was prescribed antipsychotic medication (Prolixin), sleep medication (Trazadone), medication for side effects (Cogentin), and a mood stabilizer (Depakote), was deemed "not dangerous," and was discharged to his parents' care.  ECF No. 35 at 5.

Gough moved into a house owned by his parents in Pollock, Louisiana.  ECF No. 39 at 10.  While residing there, Gough discharged a pistol into the walls of that house.  ECF No. 39 at 10.  Seeking assistance, Gough's parents visited the Grant Parish Sheriff and explained that they wanted to have their son taken to a mental health facility.  ECF No. 39 at 11.  Gough's parents were referred to the Grant Parish Coroner's office to have Gough involuntarily committed for a mental health evaluation.  ECF No. 39 at 11.

Gough's parents informed Coroner Nugent and his investigators, Grant Parish Sheriff's Deputies Bullock and Watkins, both verbally and in writing, of Gough's mental health problem and their intention to send him to a mental health facility. ECF No. 39 at 11.  Gough's parents also filled out a restraining order against their son while at the Coroner's office.  ECF No. 39 at 11.

Instead of taking custody of Gough and transporting Gough to Cabrini Hospital or another medical or mental healthcare facility, Bullock obtained an arrest warrant for Gough's arrest for misdemeanor simple criminal damage to property, based on what Gough's parents had related to the Coroner.  ECF No. 39 at 12.  Gough contends that Coroner Nugent, Bullock, and Watkins had decided that incarceration on a criminal charge was a better means to protect Gough's parents, for a longer period, than an involuntary commitment for a mental health evaluation would afford.  ECF No. 39 at 12.

Gough was arrested in Pineville and transferred on June 22, 2015, to the GPDC.  ECF No. 39 at 12.  He was never taken to a medical or mental health facility for evaluation.  ECF No. 39 at 12.  Gough was held in solitary confinement at the GPDC and was not given his previously-prescribed medication.  ECF No. 39 at 13.

On an unknown date, Coroner Nugent completed an undated Protective Custody Order authorizing involuntary commitment of Gough to St. Frances Cabrini Hospital for psychiatric treatment.[3]  ECF No. 35 at 9.

The Grant Parish Police Jury advised Gough that they have no documentation showing they appointed a physician or contracted with a licensed or regulated health care provider to attend to prisoners in Grant Parish confinement facilities in 2015, 2016 or 2017.  ECF No. 39 at 13.

Gough's parents contacted Coroner Nugent, Bullock, and Watkins, the Grant Parish Sheriff's office, Sudduth, and Churchman, both verbally and in writing, about Gough's psychological condition.  ECF No. 39 at 13-14.  Gough's mother spoke with Churchman and Sudduth more than once to check on Gough and was told only that Gough was in solitary confinement and "believed he was running for president."  ECF No. 39 at 14.

On July 29, 2015, Coroner Nugent "extended" the Protective Custody Order to July 28, 2017 and indicated "no contact with his parents."[4]  ECF No. 35 at 10.  (The alleged extension tends to negate the assertion that the Coroner ordered that Gough be taken to the hospital for evaluation.)  There is no indication that Gough was ever evaluated by the Coroner and a second physician.

---

[3] The Coroner's Protective Custody Order is not in the record.  The FPE states the Order was not dated.  ECF No. 35 at 9.  The record does not reflect when it was written.

[4] The Coroner's "order" extending the protective order is not in the record.

Gough's placement in solitary confinement, without his medications, aggravated Gough's mental illness and caused severe mental and emotional distress. ECF No. 39 at 15.[5]   Correctional officials stated his solitary confinement, and conditions imposed, were necessary due to Gough's "violent nature," to "protect him from the general jail or prison population," and because Gough had to "earn" the right to have basic stimulus or amenities through "good behavior" like a "normal inmate." ECF No. 39 at 16-17.

On August 7, 2015, Gough was able to get out of his solitary cell in the GPDC and approached a deputy outside the building, but still inside the prison fence. ECF No. 39 at 18. When Gough spoke to the deputy, he was arrested and charged by the District Attorney with "simple escape," a felony which carries a sentence of 2 years minimum to five years maximum.[6] ECF No. 39 at 19. On August 24, 2015, Gough

---

[5] Gough was allegedly subjected to the following conditions: (1) one month in the smallest solitary confinement cell, with covered windows, without being let out, even to bathe; (2) 72 hour confinements in other solitary confinement cells without release; (3) four days in the dark in a solitary confinement cell; (4) periodic confinement with the lights on all day and night; (5) periodic closure of the window covering in his solitary confinement cell; (6) extended periods without basic toiletries such as a tooth brush; (7) isolation from human contact or meaningful stimulation such as books, magazines or music; (8) multiply physical assaults including the use of a taser, pepper spray, and other chemical substances, and being punched with a fist; (9) extended confinement to a restraint chair; (10) restriction of all canteen privileges (without a security reason) resulting in extreme weight loss due to inadequate nourishment; and (11) other extended periods of solitary confinement. ECF No. 39 at 15-16.

[6] La. Rev. Stat. Ann. § 14:110, Simple escape:
  B(4).  A person imprisoned, committed, or detained who commits the crime of simple escape as defined in Paragraph (A)(1) of this Section shall be imprisoned with or without hard labor for not less than two years nor more than five years; provided that such sentence shall not run concurrently with any other sentence. . . .

was charged by the Sheriff and the District Attorney with "simple criminal damage to property over $500 for breaking the window of his solitary confinement cell.  ECF No. 39 at 19.

On January 14, 2016, the "simple escape" charge was amended to "attempted simple escape," which carries a minimum sentence of one year and a maximum sentence of 2 ½ years.[7]  Gough claims his appointed attorney, Joseph Beck III, induced him to plead guilty to the amended charge.  ECF Nos. 1-2 at 1; 39 at 19.  Gough also states the judge commented on the record he was aware of Gough's mental derangement (ECF No. 1-2 at 4-5,) but accepted his guilty plea.  ECF Nos. 1-2 at 8-9; 39 at 19.  It was noted that the "previous" charge had been dismissed on October 8, 2015, at the request of the "victims."  ECF No. 1-2 at 2-3; 39 at 19.  The maximum sentence of 2.5 years imprisonment was imposed and suspended, and Gough was placed on supervised probation for three years.  ECF No. 39 at 19.  "Special conditions" of Gough's probation included that he submit to a mental health evaluation within 60 days, undergo the recommended treatment, pay restitution to

---

D. For purposes of this Section, a person shall be deemed to be in the lawful custody of a law enforcement officer or of the Department of Public Safety and Corrections and legally confined when he is in a rehabilitation unit, a work release program, or any other program under the control of a law enforcement officer or the department.

[7] La. Rev. Stat. Ann. § 14:27, Attempt:
D(3).  In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.

the GPDC, and pay restitution to the Grant Parish Indigent Defender Board.  ECF No. 1-2 at 10; No. 39 at 19-20.

Gough was released to his parents on January 14, 2016, but he ran away from them, blaming them for his incarceration in the GPDC.  ECF No. 39 at 20.  Gough soon returned to his parents' home and made a forcible entry.  Neighbors who did not recognize Gough called the Grant Parish Sheriff's office, and he was re-arrested within three hours of having been released.  ECF No. 39 at 20.  Officers Daniel Hebert, Billy Gentry, and Blake Arrant spoke to Gough's parents, knew the house was their property and that Gough's intent was to retrieve his own property from the residence, but arrested Gough for burglary, simple assault (on his parents), simple criminal damage to property, and violation of a protective order.  *Id.*  Gough was returned to solitary confinement.  ECF No. 39 at 18.

On February 4, 2016, a felony probation revocation hearing was held.  ECF No. 39 at 20.  Gough was not represented.  *Id.*  The court found no probable cause on all the charges except simple criminal damage to property and resisting an officer.  *Id.*  Gough's parents did not testify and had told the District Attorney that they did not want their son to be prosecuted.  ECF No. 39 at 20-21.  Gough's probation was revoked, and he was sentenced to serve "90 days turnaround."  ECF No. 1-3; No. 39 at 21.

On February 19, 2016, Grant Parish Assistant D.A. Rhea Nugent charged Gough with resisting an officer on January 14, 2016.  ECF No. 39 at 21.  The charge

of criminal damage to property was not prosecuted at Gough's parents' request.  ECF No. 1-4 at 2-3.  By that time, Gough had been transferred to the Jackson Parish Detention Center, where he was not held in solitary confinement.  ECF No. 39 at 21.

On April 8, 2016, Gough was again allegedly induced to plead guilty to resisting arrest.  ECF No. 1-4 at 4-5; No. 39 at 21.  Gough was sentenced to 45 days in the parish jail, concurrent with any other sentence and with credit for time served.  ECF No. 1-4 at 7; No. 39 at 21.  During the proceeding, Gough urinated on the courtroom floor, but no issue relating to Gough's mental competency was raised.  ECF No. 1-2 at 7-8; No. 39 at 21.

After he was released from jail, on April 27, 2016, Gough was involuntarily admitted on a Physician's Emergency Certificate ("PEC") to a hospital emergency room due to psychosis and homicidal thoughts.  ECF No. 35 at 6.  Gough was delusional and paranoid, unable to sign hospital consent forms, and was considered "gravely disabled, "dangerous to others," and "unable to seek voluntary admission." ECF No. 35 at 6.  Gough was prescribed medications for anxiety and psychosis.  ECF No. 35 at 6.

Gough was transferred voluntarily to St. Francis Cabrini Hospital on April 29, 2016, and continued treatment for psychosis.  ECF No. 35 at 6.  Gough was diagnosed with migraine headaches and psychotic disorder (not otherwise specified).  ECF No. 35 at 6.  He continued to be delusional.  ECF No. 35 at 6.  Gough was discharged on June 1, 2016, on two antipsychotic medications, and readmitted on June 3, 2016, for

continued delusions about being persecuted. ECF No. 35 at 6. He was again discharged on June 10, 2016 and readmitted on June 15, 2016. ECF No. 35 at 6. Although it was recommended that Gough be transferred to a psychiatric facility, he left against medical advice. ECF No. 35 at 6. However, Gough returned to the emergency room on June 16, 2016, with a complaint of depression, but he was lucid and not having psychotic behavior. ECF No. 35 at 6.

After his release from confinement, Gough lived in his vehicle in Texas, occasionally crossing the border into Mexico to avoid those seeking to "compel him to run for president of the United States." ECF No. 39 at 21. In Spring, Texas, Gough entered that city's police department seeking help to escape from the people who "constantly monitoring him." ECF NO. 39 at 21-22. The Spring Police discovered there was an arrest warrant issued for Gough the Grant Parish Probation Office for failure to report. ECF No. 39 at 22. Gough was arrested and transported back to Grant Parish on May 8, 2017. ECF No. 35 at 12; No. 39 at 22. When he was "booked into" the GPDC, Gough was designated as having "No" history of mental health issues or a "Psych Disorder," and was placed in administrative segregation. ECF No. 35 at 12.

On June 26, 2017, Gough had a felony probation revocation hearing, admitted he had not reported to his probation officer, and was ordered to serve the originally imposed sentence (for "attempted simple escape") of 2.5 years at hard labor with the

Louisiana Department of Corrections. ECF No. 39 at 22. Gough contends, again, that he did not have the mental capacity to proceed at the hearing.

Gough was released from prison (the Richland Parish Detention Center) in January 2018 and immediately involuntarily hospitalized for psychiatric evaluation for 11 days. ECF No. 35 at 7, 16. Upon his release from jail in January 2018, Gough was immediately involuntarily psychiatrically hospitalized for 11. ECF No. 35 at 16. Gough was diagnosed with (1) schizophrenia and (2) acute psychosis, suicidal ideation." ECF No. 35 at 7.

Gough was transferred the Vermillion Behavioral Healthcare and admitted on January 11, 2018, where he remained actively delusional and was diagnosed with paranoid schizophrenia. ECF No. 35 at 7. Gough explained that his court appearances and incarcerations had been "fake scenarios" for experiments to see how he handled stress. ECF No. 35 at 7. Gough also explained the police deliberately "induced" his PTSD to "prepare him." ECF No. 35 at 7. Gough was discharged on January 22, 2018, with medications for anxiety, psychosis, sleep, and mood. ECF No. 35 at 7. Although Gough still had grandiose delusions, he was no longer dangerous or threatening. ECF No. 35 at 7.

On August 28, 2018, Gough was actively delusional and taken by the police to the emergency room at Nashville General Hospital after a neighbor reported bizarre statements written on Gough's car and clothing. ECF No. 35 at 7. August 29, 2018, Gough was involuntarily admitted to the Middle Tennessee Mental Health system

due to concerns about harm and lacking "capacity" due to serous emotional disturbance. ECF No. 35 at 7. Gough was diagnosed with delusional disorder and mild cannabis use disorder, and prescribed medications for psychotic thoughts, mood stabilization, sleep, and side effects. ECF NO. 35 at 8. Gough was discharged on September 5, 2018. ECF No. 35 at 8.

In July 2019, Gough sought outpatient psychiatric treatment at Mayer Mental Health, L.L.C. ECF No. 35 at 8. Gough's treating psychiatrist, Dr. Vautrot, noted that Gough continued to meet criteria for a psychotic disorder in partial remission and diagnosed schizophrenia, paranoid type 1 episode, and panic disorder. ECF No. 35 at 8. Dr. Vautrot prescribed antipsychotic medication and anti-anxiety medication. ECF No. 35 at 8. Dr. Vautrot noted the presence of persistent symptoms of PTSD, including behavioral avoidance, being "triggered" by trauma-related cues, and symptoms of re-experiencing, and added a diagnosis of "rule out PTSD from correctional containment in jail" on October 9, 2019. ECF No. 35 at 8.

## C.  Forensic Psychological Evaluation

In November 2019, Gough underwent a FPE by Nathaniel Stephenson, Psy.D., and Gina Manguno-Mire, Ph.D., ABPP, both of the Tulane University School of Medicine Department of Psychiatry and Neurology.[8] ECF No. 35 at 1. The focus of

---

[8] Board certification in psychology by the American Board of Professional Psychology.

the evaluation was Gough's mental and emotional condition at the time of his arrest in Grant Parish.  ECF No. 35 at 1.[9]

According to the FPE, in 2012, Gough began experiencing a marked increase in stress, and began to develop symptoms of paranoia and suspiciousness that progressed markedly over the next several years.  ECF NO. 35 at 15.  From 2012 to 2015, Gough "was likely in the prodromal or beginning phase of development of a psychotic disorder."  ECF No. 35 at 15.  From 2012 to 2015, Gough's symptoms progressed, and he began to display fixed delusions of grandeur and persecution which were severe enough to bring him to the attention of legal and medical authorities.  ECF No. 35 at 15.

Gough was first hospitalized for these symptoms in 2015.  He was diagnosed with "psychotic disorder – not otherwise specified" and cannabis abuse, and he was prescribed antipsychotic medication.  ECF No. 35 at 15.  Gough was psychiatrically hospitalized for psychosis six more times between 2016 and 2018, involuntarily multiple times, and on more than one occasion he was declared by a physician to be "gravely disabled" because he could not care for himself or make decisions in his own best interest due to a serious mental illness.  ECF No. 35 at 15.  Some of this time apparently overlapped with Gough's periods of incarceration in Grant Parish.  ECF No. 35 at 15.

---

[9] The evaluators did not have access to Gough's prescription records, due to his inability to recall his prescriptions.  ECF No. 35 at 2.  Gough's psychotherapy records were requested but "unavailable." ECF No. 35 at 2.  Gough's law enforcement records were likewise requested but "unavailable."  ECF No. 35 at 2.

The psychologists further found that Gough is presently stable and in remission from symptoms of psychosis and substance abuse but continues to exhibit symptoms of posttraumatic stress disorder because of his experiences while incarcerated. ECF No. 35 at 15. Gough was diagnosed with: (1) posttraumatic stress disorder; (2) delusional disorder, persecutory type, first episode, currently in full remission; (3) cannabis use disorder, mild, in sustained remission; and (4) stimulant use disorder, mild, in sustained remission. ECF No. 35 at 15.

## II.    Law and Analysis

### A.    The standards governing a 12(b)(6) Motion to Dismiss.

A court may grant a motion to dismiss for "failure to state a claim upon which relief can be granted" under Fed. R. Civ. P. 12(b)(6). "[A] complaint will survive dismissal for failure to state a claim if it contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Legate v. Livingston*, 822 F.3d 207, 210 (5th Cir. 2016), cert. den., 137 S. Ct. 489 (U.S. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal citation and quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The court must view all well-pleaded facts in the light most favorable to the plaintiff. *See Yumilicious Franchise, L.L.C. v. Barrie*, 819 F.3d 170, 174 (5th Cir. 2016).

### B.    Gough's claims are timely.

All Defendants argue that all of Gough's claims – his § 1983, state law, and ADA claims – are untimely.   Gough contends the limitations period for his § 1983 and state law claims should be equitably tolled, and that a four-year limitation period applies to his ADA claims.

### 1.    The limitation period for Gough's § 1983 and state law tort claims should be equitably tolled.

Defendants contend that Gough's § 1983 and state law tort claims are untimely.  According to Defendants, Gough's Complaints show that no one believed Gough was incompetent until 2017.  Gough's claims are timely under both *Corsey v. State Dept. of Corrections*, 375 So.2d 1319, 1322 (La. 1979) (suspending the limitation period) and equitable tolling.

State law supplies the applicable limitations period and tolling provisions in federal actions.  *See Harris v. Hegmann*, 198 F.3d 153, 157 (5th Cir. 1999).  Section 1983 actions in Louisiana are governed by a one-year prescriptive period.  *See* La. C.C. art 3492; *Owens v. Okure*, 488 U.S. 235, 249-50 (U.S. 1989); *McGregor v. LSU Bd. of Supervisors*, 3 F.3d 850, 863-64 (5th Cir. 1993), cert. den., 510 U.S. 1131 (1994). This prescriptive period commences to run from the date injuries or damages are sustained.  *See Washington v. Breaux*, 782 F.2d 553, 554 (5th Cir. 1986).

"When tortious conduct and resulting damages are of a continuing nature, prescription does not begin until the conduct causing the damages is abated." *Williams v. Otis Elevator Co.*, 557 Fed. Appx. 299, 301 (5th Cir. 2014).  The continuing violation theory provides that where the last act alleged is part of an ongoing pattern

19

of discrimination and occurs within the filing period, allegations concerning earlier acts are not time-barred. *See McGregor*, 3 F.3d at 866. For the continuing tort doctrine to apply, the *operating cause* of the injury must be continuous. *See Williams*, 557 Fed. Appx. at 301.

Under the doctrine of *contra non valentum*, prescriptive period commences to run from the time the plaintiff knew or could reasonably have known he had a cause of action. *See McGregor*, 3 F.3d at 865; *see also Corsey*, 375 So.2d at 1322. Federal courts have applied the doctrine in § 1983 cases when equitable tolling was invoked. *See,* e.g., *Broussard v. Brown,* 599 Fed. Appx. 188, 188-89 (5th Cir. 2015); *Walker v. Gusman,* 2015 WL 2354071, at *8 (E.D. La. 2015).

"The doctrine of equitable tolling preserves a plaintiff's claims when strict application of the statute of limitations would be inequitable." *See Alexander v. Cockrell*, 294 F.3d 626, 629, 630 (5th Cir. 2002) (*citing U.S. v. Patterson*, 211 F.3d 927, 930-31 (5th Cir. 2000)). "Equitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *See Patterson*, 211 F.3d at 930 (*quoting Rashidi v. American President Lines*, 96 F.3d 124, 128 (5th Cir. 1996)). The petitioner bears the burden of proof concerning equitable tolling and must demonstrate "rare and exceptional circumstances." *See Alexander*, 294 F.3d at 629; *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999), cert. den., 531 U.S. 1164 (2001) (A court can allow

an untimely petition to proceed under the doctrine of equitable tolling "in extraordinary circumstances.").

Equitable tolling principles apply to civil rights cases filed under 42 U.S.C. § 1983. *See Stovall v. Lena*, 2013 WL 5234113, at *3 (W.D. La. 2013) (*citing Rotella v. Pederson,* 144 F.3d 892, 897 (5th Cir.1998)). The Fifth Circuit has recognized the possibility that mental incompetency might support equitable tolling of a limitation period. See *Fisher,* 174 F .3d at 715 (*citing Hood v. Sears, Roebuck & Co.*, 168 F.3d 231, 232-33 (5th Cir. 1999)). State equitable tolling principles control in § 1983 cases. *See King-White v. Humble Independent School District*, 803 F.3d 754, 764 (5th Cir. 2015) (*citing Rotella,* 144 F.3d at 897).

In *Corsey,* 375 So.2d at 1321, the Louisiana Supreme Court set forth the categories of situations in which the doctrine of *contra non valentum*[10] applies so as to prevent the running of  liberative prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not

---

[10] *Contra non valentum agree nulla currit prasecriptio*–prescription does not run against a party unable to act.

induced by the defendant. *See Chaney v. State Through Department of Health & Human Resources.*, 432 So.2d 256, 258–59 (La. 1983).

"Louisiana jurisprudence . . . distinguishes between personal disabilities of the plaintiff (which do not prevent prescription from running) and an inability to bring suit for some cause foreign to the person of the plaintiff (which does suspend its running)." *See Corsey*, 375 So.2d at 1322–23. "Thus, a person whose ignorance of his cause of action or inability to assert it is the result of his own mental incapacity cannot claim the benefits of this rule unless he has been interdicted." *See Corsey*, 375 So.2d at 1323.

A prisoner may not escape the running of the limitation period "based merely upon his inability to attend to his affairs because of his personal illness" unless: (1) that illness arises from the fault of the defendant; or (2) the plaintiff has been interdicted due to mental incompetence.    *See Brown v. Dove*, 519 Fed. Appx. 237, 238 (5th Cir. 2013), cert. den., 571 U.S. 915 (2013) (citing *Corsey,* 375 So.2d at 1323). Where the defendant's own tort has produced the plaintiff's mental and physical inability to file suit during the period of tort-caused incompetency, prescription is suspended. *See Corsey,* 375 So.2d at 1323 (the parties entered a limited stipulation that plaintiff was mentally incapacitated until July 1973 due to defendant's negligence).

So, Gough may not rely solely on his mental incompetence to suspend the running of prescription. But if Gough can show his mental incompetence was induced,

caused, or exacerbated (to the point of mental incompetence) by Defendants, the limitations period could be suspended.

## 2. The nature and legal basis for Gough's detention are disputed.

To understand the running of the statute of limitations, one must first understand whether Gough was subjected to civil or criminal detention.

It appears that Gough's parents sought a civil detention order. It is not clear, however, whether Gough was ultimately detained pursuant to such an order or because of criminal charges against him. The record does not indicate Gough was prosecuted for simple damage to property. And the charge was dismissed in October 2015.

Still, Gough was detained for roughly seven months, but did not undergo a mental health evaluation. According to the FPE, the Coroner completed an undated order in June 2015, and then "extended" that order – for roughly two years – in July 2015.[11]

This order may have been governed by La. R.S. 33:1555, "Grounds for confinement of patient," which stated:

> Upon the representation and written application of a near relative, or in the absence of relatives, a near friend, curator, or other responsible citizen, or upon a directive from the judge of a municipal court, or a justice of the peace, that any person is mentally ill, mentally defective, inebriate, addict, epileptic, or psychopathic, and is in need of observation

---

[11] The Court is unaware of a provision of Louisiana law that permits a coroner to extend detention beyond 3 days. If the detainee is not evaluated by a mental health profession within 3 days, he must be released. La. R.S. 28:53.2(D). And a judicial commitment cannot exceed 180 days. La. R.S. 28:56(A).

or care in a mental hospital, *such person may be ordered apprehended and detained by the coroner for a reasonable length of time for examination and observation, or may be confined by the coroner in a mental hospital or jail for examination, observation care and treatment, for the accused person's own good and for the peace and safety of the community. . . .* [Emphasis added.]

Further, La. R.S. 28:53.2(A) provides, in relevant part:

A. Any <u>parish coroner</u> or judge of a court of competent jurisdiction may order a person to be taken into <u>protective custody and transported to a treatment facility or the office of the coroner for immediate examination</u> when a peace officer <u>or other credible person executes a statement under private signature</u> specifying that, to the best of his knowledge and belief, the person has a mental illness or is suffering from a substance-related or addictive disorder and is in need of immediate treatment to protect the person or others from physical harm. The statement may include the following information: . . . .

La. R.S. 28:53.2(D), as amended in 2014 (2014 Acts, No. 53, § 1), provided:

<u>The order for custody shall be effective for seventy-two hours from its issuance by the coroner</u> or judge and shall be delivered to the appropriate law enforcement agency for execution by hand, facsimile, or other electronic means, including but not limited to e-mail. The law enforcement officer or transporting person shall deliver a copy of the order for custody to the coroner, patient, and director of the treatment facility upon execution with the date and hour that the person is taken into protective custody clearly written on the order. <u>Without delay, and in no event more than twelve hours after being taken into protective custody, the person shall be delivered to a treatment facility or the office of the coroner or he shall be released.</u> Upon arrival, the person in custody shall be examined immediately by the coroner or, if at a treatment facility, by a physician, preferably a psychiatrist, medical psychologist, or psychiatric mental health nurse practitioner, who shall determine if the person shall be voluntarily admitted, admitted by emergency certificate, admitted as a noncontested admission, or discharged. <u>The person in custody shall be examined within twelve hours of his arrival at the treatment facility or coroner's office or he shall be released.</u>

24

At this point, the record is incomplete as to the legal basis for Gough's initial confinement. Thus, at this point, the applicability of these statutes (or others), and the import of subsequent charges against Gough, remain in dispute.

### 3.    Gough's competence, the issue of "inducement," and other relevant issues remain disputed.

Gough alleges in his Amended Complaint that his paranoid schizophrenia impairs his ability to learn, concentrate, think, communicate, interact with others, care for himself, and work. ECF No. 39 at 17. It also impaired his ability to understand the criminal process or to assist counsel. ECF No. 39 at 17-18.

Gough has shown that he was diagnosed with a psychotic disorder (not otherwise specified) in March 2015, and prescribed medication. ECF No. 35 at 5. Gough was confined in the GPDC in June 2015. Gough was not provided a mental health evaluation or mental health care while he was confined in the GPDC, even though he was detained there by the Coroner's Protective Custody Order. His confinement at the GPDC took place from June 2015 through April 2016 and May 2017 through June 2017. Gough filed his complaint on September 9, 2019. Gough alleges that, while he was confined in the GPDC, his mental illness was aggravated by: extended periods of solitary confinement; placement in the smallest (windowless) solitary confinement cell for a month (without being allowed to leave for two weeks-not even to bathe); 72-hour confinement (without leaving for any reason) in other solitary confinement cells; four days in darkness in one solitary confinement cell; many 24-hour periods during which the lights stayed on; days in windowless cells;

extended periods without basic toiletries such as a toothbrush; virtually complete isolation from human contact or any meaningful stimulation such as books, magazines or music; multiple physical assaults by officers (with a taser, pepper spray, other chemical substances, and punching); extended confinement in a restraint chair; and restriction of all canteen privileges resulting in extreme weight loss.   ECF No. 39 at 15-16.

The forensic psychologist found that, from approximately 2012 through 2018, Gough was actively delusional and unable to act in his own best interest or make reasoned decisions.   The forensic psychologist also found that Gough's detention/incarceration in solitary confinement and administrative segregation contributed to an exacerbation or his psychotic symptoms, perpetuation of a state of mental incompetence, and the development of PTSD.   ECF No. 35 at 16.   Gough's severe mental illness was untreated during the entire period of his detention/incarceration in the GPDC.

Although Gough was not incarcerated from April 2016 to May 8, 2017, he remained actively delusional.  The sole reason Gough was re-arrested on May 8, 2017, was because he was on probation in Grant Parish and had failed to report.  When Gough sought assistance (due to his delusions) from the Spring, Texas city police, he inadvertently and unknowingly placed himself back into the custody of the Defendants.

Accepting the allegations in Gough's complaint as true for purposes of their Motions to Dismiss, Defendants actively participated in Gough's illegal detention in the GPDC. Gough was purportedly detained by the Coroner's Protective Custody Order. Under La. R.S. 28:32.1, that order was valid for 3 days only. When the Coroner, without legal authority, "extended" the order for two additional years, Gough's detention was no longer legal. Thus, Gough's continued detention by the Sheriff and his employees were illegal.[12]

Accepting those assertions as true for purposes of these Motions, Defendants now ask the Court to afford them the benefit of Gough's mental incompetence, which they apparently exacerbated and perpetuated, and find that his "incompetence" does not excuse his untimeliness in filing his complaint.

In *Corsey*, 375 So.2d at 1320, the plaintiff alleged that the defendants' tort caused physical and mental (brain) injuries that so mentally incapacitated him that he lacked any understanding of what had happened to him and of his possible legal remedies until July 1973, when he began to recover awareness. The Court stated that it had not previously "been confronted by a case in which the same wrongdoing that gave rise to the cause of action also made it impossible for the plaintiff to avail himself of his legal remedy because of the tort-caused mental incapacity." *See Corsey*, 375 So.2d at 1323-24.

---

[12] Gough's convictions for "attempted escape" and "misdemeanor criminal damage to property," and his probation, subsequent arrest, and incarceration, all appear to be direct consequences of his illegal detention in the GPDC.

The Court was careful to state that it was not concerned with whether the plaintiff's cause of action had accrued (it had) or with his mental competency (because he had not been interdicted). *See Corsey*, 375 So.2d at 1323. Instead, the Court found the defendant's own tort produced the plaintiff's mental and physical inability to file suit during the period of tort-caused incompetency. *See Corsey*, 375 So.2d at 1323. Due to Defendant's wrongful conduct, the Plaintiff was unable, because of the tort-caused mental incompetency, to know he had a cause of action or to have the mental ability to pursue it. *See Corsey*, 375 So.2d at 1323. The Court noted that fault or wrongful conduct of the defendant that prevents the plaintiff from suing timely is a traditional *contra non valentem* reason to except the plaintiff's claim from prescriptive extinguishment. *See Corsey*, 375 So.2d at 1323. "To permit prescription to run under the present facts would permit a defendant with custody and control over a person he had tortiously injured to profit by his subsequent laxity in medical treatment, where (as here stipulated) the injured person's recovery of mental faculties was retarded beyond the prescriptive period. The plaintiff in these circumstances is doubly helpless to file suit by virtue both of his mental incapacity and of his removal from the solicitous attention of relatives and friends who might act in his stead." *See Corsey*, 375 So.2d at 1324. The Court refused to allow the defendants to profit by their own wrong and held that prescription was suspended until the plaintiff recovered awareness of the events and of his condition. *See Corsey*, 375 So.2d at 1321, 1324.

28

In *Wilson v. Hargroder*, 46 F.3d 67, *2-*3 (5th Cir. 1995), the Fifth Circuit refused to apply *contra non valentem* where the plaintiffs "were not incarcerated during the years following the alleged abuse by Defendant," they were able to communicate and make themselves understood at all times, they did not seek psychological or psychiatric treatment, and did not offer any expert medical testimony establishing that they suffered from mental trauma or post-traumatic stress disorder.  The court found their claims were untimely.  Likewise, in *Lloyd v. Howard,* 566 So.2d 424, 425 (La. App. 3d Cir. 1990)*,* the court declined to apply the doctrine although the injured plaintiff-prisoner claimed she was unable to file suit because of veiled threats by the Sheriff.  The Court noted the plaintiff had been able to consult an attorney.

In *Eaglin v. Eunice Police Department*, 2017-1875 (La. 6/27/18), 2018 WL 3154744, **8, the Louisiana Supreme Court declined to apply the doctrine of *contra non valentem but* noted that the doctrine might be applicable to false arrest and imprisonment claims under an appropriate set of facts.

Gough's case is like *Corsey.*  *Corsey* involved a plaintiff's extreme failure to understand that he had been injured by the defendant, to the extent that the plaintiff only became aware of his rights once the prescriptive period had ended.  *See Crane v. Childers*, 655 Fed. Appx. 203, 205 (5th Cir. 2016).

Similarly, the symptoms of Gough's serious mental illness–delusions and disruptions in thinking and behavior–were exacerbated by his extended detention in

jail and solitary confinement.  ECF No. 35 at 16.  As stated in the FPE, Gough was unable to rationally consider his legal options or to protect his legal rights in a knowing, intelligent, or voluntary manner.  It does not appear that Gough understood what had occurred or was aware that he had a cause of action until sometime after September 2018.  Because the Coroner's order stated that Gough's parents could not visit him,[13] and the jail officials kept Gough isolated, Gough's family was not able to assist him.

The medical history before the Court, set forth in the FPE, appears to indicate that Gough remained actively delusional through his release to his family from Middle Tennessee Mental Health on September 5, 2018.  ECF No. 35 at 8.  It appears that Gough showed improvement sometime in 2019.  ECF No. 35 at 8.  If that is the case, Gough would not have known that he had a cause of action until later in 2018 or in 2019.[14]

Accepting Gough's assertions as true for purposes of this Motion, Defendants' actions caused and/or perpetuated Gough's mental incompetence.  As a result, Gough was unable to realize he had a cause of action and to act on it in a timely manner.

---

[13] According to the Forensic Psychological Report.  ECF No. 35 at 10.

[14] A verifiable timeline of events cannot be constructed without evidence.  In a similar case of a detention for mental incompetence that failed to follow the procedural laws for civil detention, *Harris v. Clay County, Miss.,* 448 F. Supp. 3d 629 (N.D. Miss. 2020), the court considered similar motions to dismiss.  Many of the Defendants had not answered the complaint, and discovery had not taken place.  The court found that, given the seriousness of the allegations and the scarcity of information regarding exactly what actions were taken by each defendant, the defendants' remaining arguments would be better considered in the context of a summary judgment motion after completion of discovery.

Since Gough apparently became aware of his cause of action in late 2018 (at the earliest), his September 2019 Complaint was timely.

Therefore, Defendants' Motions to Dismiss Gough's § 1983 and state law claims as untimely should be denied.

### 4.    Gough's ADA claims are timely.

Gough contends the four-year statute of limitations under the "catchall statute," 28 U.S.C. § 1658(a), applies to his ADA claims.

The ADA is a federal anti-discrimination statute designed "[t]o provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *See Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002), cert. den., 540 U.S. 810 (2003) (citing *Rizzo v. Children's World Learning Centers, Inc.,* 173 F.3d 254, 261 (5th Cir. 1999), on reh'g, 213 F.3d 209 (5th Cir. 2000), cert. den., 531 U.S. 958 (2000)).  The language in the ADA generally tracks the language set forth in the RA and expressly provides that "[t]he remedies, procedures and rights" available under the RA are also accessible under the ADA.  42 U.S.C. § 12133 (1995);[15] s*ee also Delano-Pyle*, 302 F.3d at 574.  Thus, "[j]urisprudence interpreting either section is applicable to both."  *See Delano-Pyle*, 302 F.3d at 574 (quoting *Hainze v. Richards,* 207 F.3d 795, 799 (5th Cir. 2000), cert. den., 531 U.S.

---

[15] The ADA provides, at 42 U.S.C. § 12132.  Discrimination:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

959 (2000)).  A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional discrimination.  *See Delano-Pyle*, 302 F.3d at 574 (citing *Carter v. Orleans Parish Public Schools,* 725 F.2d 261, 264 (5th Cir. 1984)).

Neither Title II nor the Rehabilitation Act provides a limitations period.  *See Frame v. City of Arlington*, 657 F.3d 215, 236 (5th Cir. 2011), cert. den., 565 U.S. 1200 (2012).  Therefore, an analogous limitation period is borrowed from state law.  *See Frame*, 657 F.3d at 237.  In this case, Louisiana's one-year limitation period for personal injury actions applies to the ADA and the RA.  *See Bailey v. Bd. of Commissioners of Louisiana Stadium & Exposition Dist.,* 427 F. Supp. 3d 806, 817 (E.D. La. 2019); *see also Reeves v. Leblanc*, 2016 WL 828744, at *2 (M.D. La. 2016), report and recommendation adopted, 2016 WL 901286 (M.D. La. 2016).

For actions arising under federal statutes enacted after December 1, 1990, courts must apply a catchall four-year statute of limitations under 28 U.S.C. § 1658(a).[16]  *See Fletcher v. Louisiana Department of Transportation & Development*, 2019 WL 3240056, at *4 (M.D. La. 2019), appeal filed, Case No. 19-30668 (5th Cir. 2019).

---

[16] § 1658. Time limitations on the commencement of civil actions arising under Acts of Congress.

    (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

The ADA was enacted in 1990 and the RA was enacted in 1973, both prior to December 1, 1990. However, Congress enacted the ADAAA, effective January 1, 2009. The ADAAA revised the definition of "disability" applicable to both the ADA and the RA. *See Fletcher*, 2019 WL 3240056, at *4. The purpose of the amendment was to broaden the definition of "disability" to expand coverage. *See Fletcher*, 2019 WL 3240056, at *4.

The determination of the applicable limitations period under the ADA and the RA turns on whether Gough's claims were cognizable *before* the ADAAA was enacted and/or whether the ADAAA made Gought's claims possible. *See Fletcher*, 2019 WL 3240056, at *4. A claim is considered "cognizable" before the ADAAA amendments if Plaintiff's allegations fall within the pre-amendment version of the RA and ADA. *See Fletcher*, 2019 WL 3240056, at *4. Whether the ADAAA made Gough's claims "possible" means that the claim "necessarily depends" on the amendments to the statute. *See Fletcher*, 2019 WL 3240056, at *4. The standard "made possible" has also been explained as, "[a]n amendment to a federal statutory scheme that affords the *opportunity to seek a remedy not theretofore available* fits comfortably within the purview of section 1658." *See Fletcher*, 2019 WL 3240056, at *4. However, "made possible" is not to be so narrowly construed as to require the "post-1990 statute" to "establish a new cause of action without reference to preexisting law." *See Fletcher*, 2019 WL 3240056, at *4; *see also Guy v. LeBlanc*, 400 F. Supp. 3d 536, 542 (M.D. La. 2019).

33

"The primary purpose of the ADA Amendments Act is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the ADA Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the definition of 'disability' in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of 'disability.' The question of whether an individual meets the definition of 'disability' under this part should not demand extensive analysis." 28 C.F.R. § 35.101(b).

The ADAAA's broadened definition of "disability" is set forth in 28 C.F.R. § 35.108(d)(2), and expressly includes schizophrenia, in (d)(2)(iii)(K), as an impairment that substantially limits a major life activity due to substantial limitation of brain function:

> 2) Predictable assessments.
>> (i) The principles set forth in the rules of construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.
>>
>> (ii) Applying these principles, the individualized assessment of some types of impairments will, *in virtually all cases*, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, *virtually always*

34

be found to impose a substantial limitation on a major life activity. Therefore, *with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.*

(iii) For example, applying these principles *it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated.* The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K). . . .

> (K) Major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and *schizophrenia* each *substantially limits brain function.* [Emphasis added.]

Prior to enactment of the ADAAA, the United States Fifth Circuit Court of Appeals found, in *Greene v. Potter*, 240 Fed. Appx. 657, 659-60 (5th Cir. 2007),[17] that a plaintiff who suffered from chronic paranoid schizophrenia and depression, for which he took medication, was not disabled within the meaning of the RA. The Fifth Circuit found that Green failed to take his medication regularly as needed to control his symptoms, and there was no evidence that his impairment limited a major life activity or interfered with his ability to be at work. *See also, Zaragoza v. Dallas*

---

[17] Defendants also cited *Mangin v. Schiro*, 2006 WL 8456199, at *2 (E.D. La. 2006) and *Gibson v. Fobbs*, 2005 WL 6439534, at *3 (S.D. Tex. 2005). However, in *Mangin*, the court only appointed counsel for a plaintiff who suffered from schizophrenia, because he "simply does not possess the requisite experience, cognitive ability or mental/emotional stamina to either respond *pro se* to the substance of the pending motion to dismiss or to develop the record in this case in the event that his case survives the pleading stage." In *Gibson*, the court dismissed the ADA claim because the plaintiff failed to allege discrimination or that he was denied any prison services, programs, or activities.

*County,* 2009 WL 2030436, at *10 (N.D. Tex. 2009) (schizophrenic plaintiff was not disabled under the RA) (citing *Greene* and finding the ADAAA was not retroactively applicable); *Hamilton v. Sweetin,* 2009 WL 399113, at *8 (E.D. Tex. 2009) (plaintiff with schizophrenia and manic/depressive disorder was not disabled for purposes of the ADA and the RA). The ADAAA overrules *Greene v. Potter* because the Court may no longer consider "the ameliorative effects or mitigating measures" such as medication. 42 U.S.C. § 12102(4)(E)(i)(I).

Some Defendants cite *McNeal v. Louisiana Department of Public Safety and Corrections,* 2021 WL 359737, *12- (M.D. La. 2021), to show a one-year prescriptive period applies to "mental impairments" under the ADA. In *McNeal*, the Plaintiff suffered from substance-induced psychosis, and simulant and opiate use disorders. Because the issue was fact-intensive, the Court found the Plaintiff had not alleged sufficient facts to show his disability was made possible by the ADAAA, and thus fell within the four-year limitation period, but permitted the Plaintiff to amend his complaint to cure those deficiencies. This case is distinguishable from *McNeal* because Gough has alleged sufficient facts to show his schizophrenia was neither episodic nor in remission and, under 28 C.F.R. § 35.108(d)(2)(iii)(K), impaired at least one major life activity–brain function.

Because the ADAAA declared that Gough's schizophrenia is a disability under the ADA, due to its limitation of brain function, the four-year limitation period of 28

U.S.C. § 1658(a) applies to Gough's ADA claims.  Defendants' Motions to Dismiss (ECF Nos. 20, 21, 44, 48) Gough's ADA claims as untimely should be denied.

### C.    Defendants are not liable in their individual capacity under the ADA.

Gough sues Grant Parish, (former) Coroner Nugent (sued in both his individual and official capacities), Deputy/Investigator Bullock (sued in his individual capacity), and Deputy/Investigator Watkins (sued in his individual capacity) under the ADA.  Defendants contend the ADA does not apply to individual capacity claims.

Title II of the ADA commands that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  *See City & County of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 608 (2015).

Title II forbids discrimination by public entities.  Gough may not sue Defendants in their individual capacities under Title II of the ADA.  *See Hay v. Thaler,* 470 Fed. Appx. 411, 417 n. 19 (5th Cir. 2012) (citing *Lollar v. Baker*, 196 F.3d 603, 609 (5th Cir. 1999) (there is no individual liability in lawsuits under the Rehabilitation Act)); *Pitre v. David Wade Correctional Center,* 2008 WL 466160, at *5  (W.D. La. 2008); *Wiley v. Thompson*, 2008 WL 112110, at *7-*8 (E.D. Tex. 2008) (citing *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1005 n. 8 (8th Cir. 1999)); *see also Wells v. Thaler*, 460 Fed. Appx. 303, 313 at n. 22 (5th Cir. 2012).

Because Coroner Nugent, Bullock, Watkins, Sudduth, and Churchman are not subject to individual liability under the ADA, their Motions to Dismiss (ECF Nos. 20, 21, 44, 48) should be granted in part and Plaintiff's ADA claims against them should be dismissed.  The only remaining ADA claims are against the Coroner and the Sheriff in their official capacities.

### D. Coroner Nugent does not have immunity in his official capacity from suit under the ADA, nor does he have immunity in his individual capacity from suit under § 1983 and state law.

Gough also sues Coroner Nugent in his official capacity under the ADA and in his individual capacity under state law.  Coroner Nugent claims immunity from suit.

Coroner Nugent is no longer the Grant Parish Coroner.  To the extent that he is sued in his official capacity, the current officeholder of the office of Grant Parish Coroner is substituted for Coroner Nugent, in his or her official capacity only, and will be responsible for any liability incurred by Coroner Nugent in his official capacity.  *See* Fed. R. Civ. P. 25(d).[18]

In Louisiana, the office of coroner is created by the Louisiana Constitution, performs state functions, and is within the judicial branch of state government.  *See Mullins v. State of Louisiana*, 387 So. 2d 1151, 1152-53 (La. 1980); *see also Carriere*

---

[18] Rule 25(d).  Public Officers; Death or Separation from Office.  An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  The officer's successor is automatically substituted as a party.  Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.  The court may order substitution at any time, but the absence of such an order does not affect the substitution.

v. *St. Landry Parish Police Jury*, 97-1914 (La. 3/4/98), 707 So.2d 979, 981.  However, although the office of coroner is a judicial office, the coroner is not entitled to judicial immunity.  *See Burns v Genovese*, 223 So.2d 160, 162-164 (La. 1969); *see also Harris v. Brustowicz*, 95-0027 (La. App. 1 Cir. 10/6/95), 671 So.2d 440, 443–44.

La. R.S. 28:53.2[19] provides coroners and assistant coroners with only qualified immunity.  Specifically, La. R.S. 28:53.2E (added by Acts 1990, No. 516, § 1 (as § D), effective September 7, 1990), provides that coroners and assistant coroners "who act in good faith to order persons to be taken into protective custody and transported for examination *in accordance with this Secti*on shall not be civilly liable for damages to such persons resulting from those actions."  *See Harris,* 671 So.2d at 443–44.  Because none of the procedures set forth in La. R.S. 33:1555 and La. R.S. 28:52 was followed by Coroner Nugent, he is not entitled to immunity.

Coroners are authorized to detain persons for evaluation by "admission by emergency certificate."  *See U.S. v. Giardina*, 861 F.2d 1334, 1335-36 (5th Cir. 1988).  A coroner's detention does not constitute a commitment.  *See Giardina*, 861 F.2d at 1336 (*citing Burns*, 211 So.2d at 337)).  A commitment is ordered by a district court after the procedures for a formal judicial commitment have been followed.  *See Giardina*, 861 F.2d at 1336 (*citing Burns*, 211 So.2d at 337)). [20]

---

[19] "E. Coroners and assistant coroners who act in good faith to order persons to be taken into protective custody and transported for examination in accordance with this Section shall not be civilly liable for damages to such persons resulting from those actions."

[20] The Fifth Circuit explained the difference between a coroner's detention and a commitment in *Giardina*, 861 F.2d at 1336 (citing *Burns,* 211 So.2d at 337):

Where a coroner adheres to the statutory procedure for detention of persons for mental evaluation, the coroner is granted personal immunity for any cause of action arising from the detention. *See Burns v. Genovese*, 211 So.2d 336, 338 (App. 1 Cir. 1968), rev'd on other grounds,  223 So.2d 160 (La. 1969).  However, immunity does not apply where the petition alleges an illegal commitment.[21]  *See Delatte v. Genovese,* 228 So.2d 252, 253 n. 24 (La. App. 1st Cir. 1969) ("Where the coroner acts in the absence of statutory authorization [in signing a commitment order] (and, presumably, by inference, when he acts contrary to the terms of the statute), he is liable in damages under Louisiana law for his action in that event are "illegal and

---

As revised and reenacted, the Louisiana Mental Health Law reflected the reasoning of the *Burns* court and conspicuously avoided use of the words "commitment" and "committed."  In lieu thereof La. R.S. 28:53 uses the terms "admission" and "detained."  With one exception,[3] the amended statute reserves the use of the word commitment for R.S. 28:54 which details the procedure for the formal judicial commitment.  The provision formerly entitled "Coroner's Commitment" is now entitled "Admission by Emergency Certificate."

As revised and reenacted, the Louisiana Mental Health Law reflected the reasoning of the *Burns* court and conspicuously avoided use of the words "commitment" and "committed."  In lieu thereof La. R.S. 28:53 uses the terms "admission" and "detained."  With one exception,[3] the amended statute reserves the use of the word commitment for R.S. 28:54 which details the procedure for the formal judicial commitment.  The provision formerly entitled "Coroner's Commitment" is now entitled "Admission by Emergency Certificate."

[21] To state a cause of action under Louisiana state law for false imprisonment, it is sufficient that the facts alleged in the Complaint "are to the effect that plaintiff's commitment was illegal."  *See Delatte*, 228 So.2d at 253-54 (citing *Burns*, 223 So.2d at 164).  The plaintiff does not need to specifically aver "illegal commitment" or "false imprisonment."  *See Delatte*, 228 So.2d at 254; see also *Burns*, 223 So.2d at 164.

unwarranted," and he is not protected by the doctrine of immunity"); *Harris*, 671 So.2d at 443–44.

Because the facts alleged in Gough's Complaint indicate that Coroner Nugent did not follow the statutory directives when he placed Gough in "protective custody" without having him examined within 3 days, and then, without authority, extended that "protective custody" for another two years, Gough has alleged an illegal commitment. In fact, Coroner Nugent failed to follow statutory directives when he and his investigators charged Gough with simple damage to property instead having him detained for evaluation, as requested by his parents. See La. R.S. 28:53.2. Therefore, accepting Gough's allegations as true for purposes of this Motion, Coroner Nugent is not entitled to good faith qualified immunity from suit in his official capacity under the ADA, or in his individual capacity under state law or § 1983.

E.    <u>Bullock and Watkins have not shown they are entitled to immunity.</u>

Next, Defendants argue that, under La. R.S. 28:63(D)(1), Bullock and Watkins have personal immunity from suit "in their roles as deputies and detectives" for the Grant Parish Sheriff and "as investigators" for the Coroner.[22]  ECF No. 48.

La. R.S. 28:63(D)(1) states:

---

[22] Defendants have not yet explained whether both the Sheriff and Coroner employed and paid Bullock and Watkins, and whether they worked for the Sheriff and the Coroner simultaneously or at separate times. It has also not been specified in what capacity Bullock and Watkins were working during the different events alleged to have take place in this case. It is not clear whether there is any distinction between the two roles that merits separate treatment, or whether the Sheriff simply assigned two deputies to assist the Coroner with his investigations.

(1) Any apprehension or taking into protective custody and confinement made by law enforcement officers, pursuant to any authorized procedure provided in this Title, is hereby declared to be an administrative act relative to the functions of their office, as required by law, and for which act they are specifically granted personal immunity.

(2) Upon arrival at any treatment or examination facility, a law enforcement officer escorting a person apprehended or taken into protective custody and confinement under any provision of this Title shall be relieved of any further responsibility.

Pertinent language in the statute is "pursuant to any authorized procedure provided in this Title," and "upon arrival at any treatment or examination facility." Bullock and Watkins did not take Gough to a treatment or examination facility. They took him to the GPDC. Moreover, there is no evidence int eh record that Bullock and Watkins followed the "authorized procedure." Gough alleges that, after his parents asked the Coroner to have him examined, Bullock and Watkins charged Gough and arrested him. Coroner Nugent contends in his brief that, after he signed a protective custody order, the Sheriff was supposed to take Gough to a hospital for examination. Again, it is not clear which Defendant did what. It is not clear whether Bullock and Watkins followed the authorized procedure for taking a person into involuntary custody for a mental evaluation. Since they apparently arrested Gough, it does not appear that the proper procedure was followed.

Because the allegations of Gough's complaint, accepted as true for purposes of this motion, do not support Watkins' and Bullock's claims of immunity, their Motion to Dismiss (ECF No. 48) should be denied on this issue.

42

**F.    Heck v. Humphrey does not bar Gough's action.**

Coroner Nugent, Grant Parish, Bullock, and Watkins make the alternative argument that Gough's claims should be dismissed under *Heck v. Humphrey*, 512 U.S. 477 (1994).

First, it is noted that *Heck* only applies to § 1983 and state law claims that would imply the invalidity of a conviction or sentence. It does not bar claims under the ADA.

In the similar case of *Harris v. Clay County, Miss.,* Harris was charged with serious felony offenses but found incompetent to stand trial. Through a series of blunders by several different people, Harris remained in civil confinement for his mental incompetence, without being afforded commitment proceedings, for 11 years. In Harris' civil action, the defendants argued that his suit was barred by *Heck*. The district judge found that, because Harris was never convicted, *Heck v. Humphrey*, was not applicable and did not bar his civil suit. *See Harris*, 448 F. Supp. 3d at 642-43. The judge noted that a nolle pross of Harris's charges was not the "favorable outcome" of a "conviction or sentence" contemplated in *Heck. See Harris*, 448 F. Supp. 3d at 642-43 (citing *Wallace v. Kato,* 549 U.S. 384, 392-93 (2007) (holding *Heck* only applies when there is a conviction or sentence that has not been invalidated and rejecting defendants' attempt to apply *Heck* to a conviction that had not yet occurred.))

Defendants argue that Gough's claims of mental incompetence will call into question his sanity at the time of the offenses (apparently referring to the offenses committed after Gough had been detained for seven months) and the validity of his guilty pleas.

Because Gough was never convicted (or prosecuted) on the initial misdemeanor charge for criminal damage to property (discharging a firearm in his parent's house), *Heck* is not applicable to Gough's challenge to his detention for the first seven months. Although Gough was subsequently convicted for attempted escape and criminal damage to property, neither of those convictions will be necessarily invalidated by this civil action.

Defendants appear to have illegally confined Gough, due to his alleged mental illness, for seven months–and in allegedly unconstitutional conditions of confinement. After seven months in isolation, Gough contends his delusional state led him to break a window, leave his cell, and stop to talk to the first jail official he saw. As a result, Gough was charged with and induced to plead guilty to charges of "attempted escape" and "criminal damage to property."

Defendants now ask the Court to prohibit Gough from suing them for his illegal detention and unconstitutional conditions of confinement because, if he establishes he was mentally incompetent (due to the mental illness for which he was being detained), it may call into question the validity of his convictions (during his illegal confinement) for attempted escape and criminal damage to property.

First, Gough's convictions may be called into question on other bases than mental incompetence, such as illegal detention (can one be guilty of "escape" from an illegal detention?),[23] and ineffective assistance of counsel.

Second, Gough's mental incompetence appears to be already established on the record.

Third, mental incompetence is not a requisite element to be proven in Gough's federal and state law claims of illegal detention, unconstitutional conditions of confinement, discrimination, assault, and battery.[24]

Therefore, *Heck* does not bar Gough's civil action against Defendants.

### G. Gough's claims against DA Lemoine should be dismissed.

In his amended complaint (ECF No. 39), Gough states that he is voluntarily dropping all his claims against D.A. Lemoine (sued in both his individual and official capacities) due to prematurity. ECF No. 39 at 2-3. Therefore, Defendants' Motion to Dismiss (ECF No. 21, 48) should be granted in part and the claims against Lemoine should be dismissed without prejudice.

---

[23] *See State v. Austin,* 241 So. 2d 909, 910 (La. 1970) ("Conceding, arguendo, that the detention must be legal in every respect" for an "escape" to come within the purview of La. R.S. 14:110).

[24] The issue of Gough's mental incompetence underlies everything here. It is the reason he discharged a firearm in the house, the reason his parents sought his involuntary commitment, the reason a protective custody order was issued, one of the reasons he was arrested, the reason he was detained illegally, the reason he wandered out of his cell and spoke to a prison official, resulting in his convictions. It is the reason for this lawsuit.

**H.** <u>Gough states a § 1983 claim against Grant Parish</u>

Gough alleges in his Complaints that Grant Parish is liable to him under § 1983 because it: (1) maintained a *de facto* policy that created conditions and permitted treatment of prisoners that constituted impermissible punishment in violation of due process;  (2) subjected Gough to unconstitutional conditions of confinement that constituted impermissible punishment in violation of due process; (3) established a system in which prisoners with serious medical needs are denied access to medical care; (4)  established a policy, pattern, or practice to deny medical care to prisoners with serious mental health problems and needs.  Specifically, Gough contends Grant Parish failed to provide a physician or other healthcare provider for the inmates at the GPDC.

Grant Parish contends it was not responsible for providing a healthcare provider for the GPDC inmates, and that it was the Sheriff's responsibility.

The constitutional rights of a pretrial detainee flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment.  *See Hare v. City of Corinth*, 74 F.3d 633, 638 (5th Cir. 1996).  To determine the appropriate standard to apply in analyzing constitutional challenges by pretrial detainees, the court must first classify the challenge as an attack on a condition of confinement or as an episodic act or omission.  *See Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997).  A condition of confinement case is a constitutional attack on general conditions, practices, rules, or restrictions of pretrial confinement.  *See Flores*, 124

F.3d at 738.  In such cases we may assume, by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation.  *See Flores*, 124 F.3d at 738.  However, if the complained-of harm is a particular act or omission of one or more officials, the action is characterized as an episodic act or omission of one or more officials, the action is characterized as an episodic act or omission case.  *See Flores*, 124 F.3d at 738 (*quoting Hare*, 74 F.3d at 644-45)).  As to the discrete, episodic act, the detainee must establish only the at the constitutional violation complained of was done with subjective deliberate indifference to that detainee's constitutional rights.  *See Scott v. Moore*, 114 F.3d 51, 54 (5th Cir. 1997).[25]  Once the detainee has met this burden, he has proved a violation of his rights under the Due Process clause.  *See Scott*, 114 F.3d at 54.

Gough alleges that Grant Parish does not provide medical or mental health care for the detainees and prisoners in the GPDC.  Failure to do so not only violates the constitutional rights of detainees such as Gough, but it violates state law as well.

---

[25] A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care.  *See Walker v. Butler*, 967 F.2d 176, 178 (5th Cir. 1992); *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987).  A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.  *See Easter v. Powell*, 467 F.3d 459, 463-464 (5th Cir. 2006) (*citing Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)); *see also, Chapman v. Johnson*, 339 Fed. Appx. 446, 448 (5th Cir. 2009) (the fact that defendant was aware that inmate had a serious injury and was instructed to provide pain relief medication, but did not do so, could demonstrate an Eighth Amendment violation).

La. R.S. 15:703 provides that the Parish is responsible for providing medical care for prisoners in parish jails:

A. The governing authority of each parish shall appoint annually a physician who shall attend the prisoners whenever they are sick. His salary shall be fixed by the governing authority.

B. In lieu of appointing a physician, the governing authority of any parish may enter into a contract with a health care provider, licensed or regulated by the laws of this state, to provide requisite health care services, as required in this Section. The term "health care provider" as used in this Subsection means a person, partnership, limited liability partnership, limited liability company, corporation, facility, or institution licensed or regulated by the laws of this state to provide health care services or professional services as a physician and qualified as such in accordance with R.S. 40:1231.2.

C. When a physician has been appointed or a contract for health care services for prisoners has been entered into in accordance with this Section, any action by a prisoner or his representative to recover damages or any other losses, including those for the death of the prisoner, as a result of the actions or inactions of the physician or health care provider in the performance or nonperformance of health care services shall be governed by the provisions of R.S. 40:1231.1 et seq. The term "health care provider" as used in this Subsection shall be as defined in R.S. 40:1231.1.

D. The sole responsibility of the governing authority of each parish which is mandated by the provisions of this Section with respect to providing health care services for prisoners shall be the appointment of a physician and the payment of the salary of that physician or its contractual obligations with a health care provider selected in accordance with this Section. The parish and its governing authority shall not be liable for any action arising as a result of the actions or inactions of the physician or health care provider, whether *ex delicto or ex quasi delicto or ex contractu,* by a prisoner or his representative to recover damages or any other losses, including those for the death of the prisoner, unless the governing authority exercises gross negligence or willful misconduct in the performance of its duties and obligations imposed by this Section, and such gross negligence or willful misconduct was a substantial factor in causing the injury.

48

*See Southwest Louisiana Hospital Association v. Hunt*, 551 So.2d 818, 820 (La. App. 3d Cir. 1989).

"[T]he City-Parish is responsible for the expenses of establishing, maintaining[,] and operating the jail and for all the expenses of feeding, clothing, and *providing medical treatment to the prisoners* while the sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for, fed and clothed." *See Southwest Louisiana Hospital Association*, 551 So.2d at 820 (quoting *Amiss v. Dumas*, 411 So.2d 1137, 1141 (La. App. 1st Cir. 1982), *writ den.*, 415 So.2d 940 (La. 1982)).  Prisoners incarcerated in the parish jail, either awaiting trial or serving parish sentences, are wards of the parish and the sheriff is the warden ("keeper") of the parish jail.  *See Amiss*, 411 So.2d at 1141.

Even if no physician or other health care provider is appointed by or contracted for by the Police Jury, the Sheriff is responsible for the inmates in his care, including ensuring they receive medical care.  *See Schaubert v. Ackal*, 2020 WL 2393706, at *5 (W.D. La. 2020), report and recommendation adopted, 2020 WL 2374786 (W.D. La. 2020).  The Sheriff is the "keeper of the public jail of his parish".  See La. R.S. 15:704; *Howard v. Fortenberry*, 723 F.2d 1206, 1210 n.9 (5th Cir.), vacated in part on other grounds, 728 F.2d 712 (5th Cir. 1984).  When a sheriff oversees a parish jail, he is responsible for such matters as the training of personnel and the safety and medical care of inmates.  *See Howard*, 723 F.2d at 1210; *see also Thompkins*, 828 F.2d at 304

49

n.8 ("[T]he sheriff has the duty of operating the jail and seeing to it that the prisoners are properly cared for.") (*citing O'Quinn v. Manuel*, 773 F.2d 605, 609 (5th Cir. 1985)).

In *Mealy v. City/Parish. of East Baton Rouge*, 716 Fed. Appx. 377, 379 (5th Cir. 2018), the City/Parish argued it was not responsible for running the prison. The Fifth Circuit held those arguments went to the heart of the plaintiff's case: the question to be resolved in the final judgment was whether the City/Parish discriminated against the plaintiff by failing to reasonably accommodate him. *See, Mealy,* 716 Fed. Appx. 377, 379 (citing *Frame,* 657 F.3d at 223–24). The Fifth Circuit reasoned that, because the district court's order rejecting those arguments was "deeply 'enmeshed in the factual and legal issues comprising [Mealy's] cause[s] of action,' [and] not completely separate from them," the denial of the motion to dismiss was proper.

In this case, the Court only the allegation of Plaintiff's Complaints and the FPE before it. Defendants have not yet shown who did what and when, as between Grant Parish and the Sheriff. Thus, there are only Gough's allegations that Grant Parish failed to arrange for a medical/mental health care provider for the GPDC inmates, and that the Sheriff failed to ensure Gough received mental health evaluation and treatment.

Accepting Gough's allegations as true for purposes of this Motion, Gough has stated a § 1983 claim against Grant Parish for denial of medical care.

I.    <u>Gough states ADA claims against Coroner Nugent and Grant Parish.</u>

50

Coroner Nugent and Grant Parish argue that Gough has not stated a claim against them under the ADA for failure to provide his mental evaluation and further medical care while in the GPDC. Coroner Nugent contends he signed the protective custody order authorizing the Sheriff to detain Gough for evaluation. Coroner Nugent is apparently arguing that, once Gough was confined in the GPDC, the Sheriff was responsible for ensuring Gough received a mental evaluation.

"It is the duty of the coroner to examine into the sanity [of persons whose commitment is sought]." *See O'Rourke v. O'Rourke*, 69 So.2d 567, 575 (La. App. Orleans 1963), amended in other part, 79 So.2d 87 (La. 1955). "'To examine in all cases', mean[s] that he should obtain such information as he might think necessary to determine whether the mental condition of the person whose commitment was sought was such as to warrant his recommending that such person be brought to the proper place for personal examination." *See O'Rourke*, 69 So.2d 575.

It appears the Coroner's statutory duty went beyond signing the order of detention for evaluation, to ensuring the patient was examined, and either commencing the commitment proceedings or releasing the patient. See La. R.S. 28:52, et seq.

Coroner Nugent also argues (apparently in the alternative) that the Sheriff was supposed to transport Gough to the treatment facility for evaluation and failed to do so. That order is not in the record before the Court. In Gough's FPE, it is noted that Coroner Nugent's order was undated. If that it so, it may be difficult to

determine when Coroner Nugent provided that order.  In any event, Coroner Nugent was aware that Gough was taken to the GPDC instead of a hospital or other treatment center because, one month later, he apparently signed another order (also not in the record) purporting to extend Gough's "protective custody" for two additional years.

Gough has stated a claim under the ADA.  To establish a cause of action for discrimination under the ADA, a plaintiff must show: (1) he is a qualified individual with a disability; (2) he was excluded from participation in, or denied the benefits of, an available service, program, or activity; and (3) such exclusion or denial was by reason of his disability.  *See Cleveland v. Gautreaux*, 198 F. Supp. 3d 717, 747 (M.D. La. 2016) (citing *Hainze,* 207 F.3d at 799); *see also Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004), cert. den., 544 U.S. 1034 (2005).

As discussed above, schizophrenia is considered a disabling impairment under the ADA.  See in 28 C.F.R. § 35.108(d)(2)(iii)(K) (schizophrenia substantially limits brain function–a major life activity).

The ADA's language unmistakably includes State prisons and prisoners within its coverage.  *See Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 209 (1998).  State (and parish) prisons fall squarely within the statutory definition of "public entity," which includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." § 12131(1)(B).  *See Yeskey*, 524 U.S. at 210.  Modern prisons provide inmates with many recreational

52

"activities," medical "services," and educational and vocational "programs," all of which at least theoretically "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in"). *See Yeskey*, 524 U.S. at 210. The text of the ADA provides no basis for distinguishing these programs, services, and activities from those provided by public entities that are not prisons. *See Yeskey*, 524 U.S. at 210. The fundamental "program" or benefit offered by prisons includes adequate medical care. *See Patrick v. Martin*, 2020 WL 4040969 at *39 (N.D. Tex. 2020), appeal filed, Doc. No. 20-10961 (5th Cir. 2020) (citing *United States v. Georgia*, 546 U.S. 151, 157 (2006)).

"Failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoner." *Cleveland*, 198 F. Supp. 3d at 747 (quoting *McCoy v. Tex. Department of Criminal Justice,* 2006 WL 2331055, at *7 (S.D. Tex. 2006)); *see also Georgia,* 546 U.S. at 157; *Patrick*, 2020 WL 4040969 at *39. "[W]here the defendant otherwise had knowledge of the individual's disability and needs but took no action," not even the failure to expressly request a specific accommodation (or modification) fatally undermines an ADA claim. *See Cleveland*, 198 F. Supp. 3d at 747 (citing *Greer v. Richardson Independent School District*, 472 Fed. Appx. 287, 296 (5th Cir. 2012)); *see also Borum v. Swisher County*, 2015 WL 327508, at *9 (N.D. Tex. 2015); *Hinojosa v. Livingston,* 994 F. Supp. 2d 840, 843–44 (S.D. Tex. 2014).

It is impossible to determine exactly which Defendant did what at this stage of the proceedings.  However, it is clear that Gough stated a claim for violation of the ADA when he alleged the Coroner denied him mental health care and an evaluation due to his disability (schizophrenia), and that Grant Parish failed to provide any health care professional for the GPDC inmates.[26]  *Compare Cleveland*, 198 F. Supp. 3d at 746 (motion for summary judgment as to ADA claim was denied where evidence showed defendants did not provide plaintiff-inmate with treatment appropriate for his documented bipolarity and schizophrenia, and placed him in lockdown for his "bizarre and abnormal behavior" and left him "shackled and handcuffed all day" more than once).

Therefore, Defendants' Motions to Dismiss Gough's ADA claim (ECF Nos. 21, 48) against Coroner Nugent (in his official capacity) and Grant Parish should be denied.

**J.    <u>Defendants' Motion to Dismiss § 1983 and state law claims against Bullock and Watkins is denied as moot.</u>**

Defendants contend Gough has not stated a claim against Bullock or Watkins under § 1983 or state law.  Gough's complaint states that Bullock's and Watkins's action deprived him of a mental evaluation and other services provided by the Coroner, in violation of the ADA.  However, as already discussed, because there is no

---

[26] The Parish's statutory obligation under La. R.S. 15:703, to employ a physician or contract with a health care provider for prisoners, is discussed above.

personal liability under the ADA (see above), those claims should be dismissed. Gough has not alleged any state law or § 1983 claims against Bullock and Watkins.

Therefore, Defendants' Motion to Dismiss other claims against Bullock and Watkins (ECF No. 48) should be denied as moot.

## III.  Conclusion

Based on the foregoing, IT IS RECOMMENDED that Defendants' Motions to Dismiss (ECF Nos. 20, 21, 44, 48) be GRANTED IN PART and that Gough's ADA claims against Coroner Nugent, Bullock, Watkins, Sudduth, and Churchman should be DISMISSED WITH PREJUDICE.  The only remaining ADA claims are against the Coroner Nugent and the Sheriff in their official capacities.

IT IS RECOMMENDED that Defendants' Motion to Dismiss (ECF No. 21, 48) should be GRANTED IN PART and the claims against Lemoine should be DISMISSED WITHOUT PREJUDICE.

IT IS RECOMMENDED that Defendants' Motions to Dismiss (ECF Nos. 20, 21, 44, 48) be DENIED in all other respects.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy

of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this _____3rd_____ day of February 2022.

Joseph H.L. Perez-Montes
United States Magistrate Judge